UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAMARINDART, LLC,<br><br>                Plaintiff,<br><br>    v.<br><br>RAISA HUSAIN AND OWAIS HUSAIN AS ADMINISTRATORS OF THE ESTATE OF MAQBOOL FIDA HUSAIN,<br><br>                Defendant. | CIVIL ACTION NO. 1:22-cv-595<br><br>ECF Case<br><br>**COMPLAINT** |

Plaintiff TamarindArt, LLC ("Tamarind"), by and through its undersigned attorneys, Offit Kurman, P.A., alleges against Defendants Raisa Husain ("RH")[1] and Owais Husain ("OH") as administrators of the Estate of Maqbool Fida Husain ("M.F. Husain Estate" "Estate") alleges as follows:

**NATURE OF THE ACTION**

1.    This is a civil action arising under the Copyright Act, 17 U.S.C. § 101 *et seq*. and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, in which Tamarind seeks a declaratory judgment of, among other things, non-infringement of any copyright rights supposedly owned by Defendant(s).

2.    In 2002, Tamarind bought a painting called "Lightning" ("Artwork") by an artist named Maqbool Fida Husain ("MFH") (who is deceased) for $400,000.00. As part of Tamarind's purchase, MFH granted Tamarind an exclusive, royalty free, worldwide license to display, market, reproduce and resell all or any part of the Artwork. MFH also agreed that Tamarind could

---

[1] Upon information and belief RH has used multiple spellings of her name on various occasions, including "Raisa" and "Raeesa."

reproduce images of the Artwork on all digital and off-line media. Finally, MFH agreed that he was no longer the owner of the Artwork or the intellectual property associated with it.

3. Tamarind has launched a campaign, the object of which is to ultimately sell non-fungible tokens ("NFTs" and "NFT Project") based on the Artwork Tamarind bought and for which Tamarind holds the exclusive, worldwide, royalty-free license to reproduce in any format, including digital formats.

4. On January 8, 2022, Tamarind received a cease-and-desist letter from Defendant. In that letter, Defendant claimed Tamarind had no right to proceed with the NFT Project. Defendant claimed that despite Tamarind's "ownership" of the Artwork, Tamarind was not the "copyright owner," and had no right "to reproduce it, distribute copies, create derivative works based on it or display it publicly." Defendant kept claiming that the NFT project would violate several provisions of the Copyright Act. Defendant demanded that Tamarind suspend and cease any activities related to the NFT Project and directed Tamarind to preserve all documents related to this dispute.

## PARTIES

5. Plaintiff TamarindArt, LLC is a limited liability company organized under the laws of the State of New York with a principal place of business at 142 East 39th Street, New York, New York, 10016 ("Tamarind Gallery"). Kent Charugundla ("Mr. Charugundla") is the sole member of Tamarind and is a citizen of New York.

6. Upon information and belief Defendant Raisa Husain ("RH") is an administrator of the M.F. Husain Estate. Upon information and belief, RH is a United States citizen residing in Mumbai, India.

7.  Upon information and belief, Defendant Owais Husain ("OH") is an administrator of the M.F. Husain Estate. Upon information and belief, OH is a Citizen of India, currently residing in Dubai, United Arab Emirates.

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction to hear this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 based on an actual controversy between Tamarind and Defendant spawned by a cease-and-desist letter Defendant sent to Tamarind on January 7, 2022 related to intellectual property rights.

9.  This Court also has subject matter jurisdiction to hear this action under 28 U.S.C. § 1331, because Tamarind does not share a state of citizenship with any Defendant, and because the amount in controversy exceeds $75,000.00 exclusive of interests and costs either as a result of Defendants' disruption of Tamarind's planned exercise of its rights or because Defendants' actions have denied Tamarind the benefit of its bargains with MFH.

10. This Court has personal jurisdiction over Defendants as administrators of the Estate step into the shoes of MFH, and MFH—as detailed throughout this Complaint—had systematic and continuous contacts with New York, including actively conducting business in New York, conducting financial transactions in New York, receiving funds from New York, delivering the object of the lawsuit to New York where it has been since 2002, and because at least one of the agreements at issue in the case set New York as the venue for any claims arising out of that agreement and because MFH submitted to the jurisdiction and venue of this Court. Alternatively, this Court has personal jurisdiction over the Defendants because MFH had minimum contacts with New York related to the subject matter of the lawsuit and purposefully availed himself of New York's laws.

11. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Tamarind's claims arising under New York state law, because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

12. Venue is proper in this judicial district under 28 U.S.C. §§ 1391.

**FACTUAL BACKGROUND**

A. **Background on MFH and Tamarind**

13. MFH was a prominent Indian artist who died on June 9, 2011 in London, England.

14. In 1975, MFH painted a 60-foot-long mural "Lightning" to serve as a backdrop to a historical speech by then-Prime Minister, Indira Gandhi.

15. The work's twelve massive panels, vivid and Cubist in style, feature wild, white horses charging across a space rich with visual references to India and to the 1970s, aptly capturing the political climate of the new nation:



16. The Artwork was often called the "Guernica" of India; the emblematic masterpiece was kept by MFH from 1975 until 2002.

17. Tamarind is a collector of fine art and has a physical gallery to display its collection at 142 East 39 Street, New York, New York, 10016. MFH used this gallery to work when he visited New York. The gallery opened in 2003 and has been in operation continuously through present, except between 2017-2020. Since the onset of the COVID-19 pandemic, however, it is open by appointment only.

18. Tamarind's principal, Mr. Charugundla, oversees all of Tamarind's operations and its acquisitions.

**B. Tamarind's Acquisition of Lightning**

19. Sometime in early 2002, an intermediary connected Mr. Charugundla and MFH to discuss Tamarind's interest in acquiring MFH's largest work—Lightning.

20. During this same time, MFH and the intermediary called Mr. Charugundla in New York City. MFH offered Tamarind several other smaller works of his (not Lightning), including one called Mother Theresa and another called Kerala. Mr. Charugundla told MFH that Tamarind was uninterested in those other works. Rather, Tamarind wanted to acquire Lightning.

21. MFH then offered to commission a work specially for Tamarind, but Mr. Charugundla told him he was uninterested.

22. Sometime between April and June 2002, MFH contacted Mr. Charugundla in New York City again and mentioned he would consider selling Lightning to Tamarind.

23. During this conversation, MFH and Mr. Charugundla negotiated the price for Lightning. But MFH's initial demand was too high for Tamarind.

24. During this conversation and the first conversation, MFH directed his calls to Mr. Charugundla in New York and knew Tamarind sought to acquire the Artwork in New York.

25. Several days after the first true negotiation, the intermediary took several photos of the Artwork on MFH's behalf, and at MFH's direction, emailed them to Mr. Charugundla in New York.

26. Over the next few months, MFH and Mr. Charugundla continued negotiations about the Lightning acquisition. Throughout this period, MFH knew he was directing his calls to Mr. Charugundla in New York and that he was negotiating for a sale of the Artwork in New York.

27. In September 2002, Christie's Auction House held an auction featuring Indian artwork.

28. At this auction, another Indian artist fetched over $300,000.00 for his largest work. Before that auction, MFH's works only fetched a fraction of that.

29. Right after the auction, MFH called Mr. Charugundla in New York and offered him Lightning. Yet MFH was still demanding a baselessly high price and they did not reach a deal.

30. On November 26th and 27th 2002, MFH and the intermediary both called Mr. Charugundla in New York.

31. During these calls, MFH offered Tamarind the opportunity to buy Lightning and another work called the "Spider and the Lamp," for $400,000.00.

32. As a sweetener, MFH told Mr. Charugundla that he would grant Tamarind "all the rights including the copyright and Intellectual property rights along with the lightning, to enable [Tamarind] to print posters or graphics or any digital works[,] or anything [Tamarind] want[ed] to do with the work to help [Tamarind] get some money back."

33. Similarly, MFH also promised Mr. Charugundla that Tamarind would "make money back on making digital copies and graphics over your lifetime and for your generation."

34. On this same call, MFH further promised Mr. Charugundla that he "had never given anyone rights before, [Tamarind] will be only [one that MFH] will ever give rights to as [Tamarind is] helping more than I can express over the phone."

35. After about an hour, Mr. Charugundla, on behalf of Tamarind, accepted MFH's offer to acquire the Artwork, and the parties began negotiations over particulars.

36. MFH knew that Tamarind was acquiring the Artwork to be delivered to New York, and that the Artwork would remain in New York and be displayed in New York.

37. The same day, MFH sent Mr. Charugundla a draft of the Bill of Sale that would govern Tamarind's acquisition of the Artwork. Mr. Charugundla, on behalf of Tamarind, agreed to the Bill of Sale as drafted.[2]

38. On November 27, 2002, Mr. Charugundla traveled to New Delhi, India to pick up the Artwork. The day before leaving, Mr. Charugundla, on behalf of Tamarind, drew a check for $400,000 from his New York Merrill Lynch account.

39. On December 1, 2002, MHF and Mr. Charugundla, on behalf of Tamarind, signed the Bill of Sale.

40. On December 1, 2002, MFH delivered the Artwork to Mr. Charugundla with full knowledge that Mr. Charugundla would pack the Artwork and take it to New York. Mr. Charugundla did just that and travelled back to New York.

**C. The Terms of the Bill of Sale**

41. The Bill of Sale that governed Tamarind's acquisition of the Artwork gave Tamarind all rights and title related to the Artwork, rights and interests previously held by MFH.

42. The Bill of Sale was between Tamarind and MFH, and it noted that Tamarind was a limited liability company organized under the laws of the State of New York. In other words, MFH knew he was contracting with a New York party.

43. MFH granted "an exclusive, royalty free, worldwide license [("License")] to display, market, reproduce and resell all or any part of the artwork, including all intellectual property in respect thereof." (Exhibit A, § 1.1).

---

[2] A copy of the executed Bill of Sale is attached as Exhibit A.

44. The License stated that it "shall also extend to the affiliate's [sic] of the Buyer and therefore has the absolute and royalty free right to sub-license the artwork to any third party in its absolute discretion to display, sell or use the same in any other manner." (*Id.*, § 1.2).

45. Further, "images of the artwork *may be reproduced by the buyer on all digital and offline media* including but not limited to apparel, gift accessories, billboards, print media and physical structures." (*Id.*, § 1.3) (emphasis added).

46. MFH represented and warranted that he had the "full power and authority to enter into, and to perform his obligations under this agreement," and that MFH "shall not continue to be the absolute owner of the artworks and the intellectual property in connection therewith." (*Id.*, § 2).

47. Finally, MFH affirmed that the License for the Artwork was granted by him to "TamarindArt LLC, New York USA."

48. Tamarind paid MFH the agreed upon $400,000 purchase price with a check from drawn from a Merrill Lynch account in New York.

49. MFH accepted the payment and cashed the check shortly after.

**D. The 2003 Agreement**

50. During one of MFH's many visits to New York after Tamarind acquired the Artwork, Tamarind and MFH executed another contract.

51. In an April 2003 visit to New York, Tamarind and MFH executed another agreement "under the laws of the State of New York," to reaffirm the contours of their relationship and create an outline the terms under which MFH would make additional works for Tamarind ("2003 Agreement"). MFH represented in the 2003 Agreement that he resided at 301 East 94th Street, New York, New York.

52. The 2003 Agreement provided that "Artist [(MFH)] agree/s that *all artworks already purchased or created for Tamarind/affiliates are considered copyright protected property of Tamarind* or its affiliates." This provision necessarily includes Lightning, the artwork at issue.

53. Further, the 2003 Agreement provided that "*Artist hereafter shall have no rights on/in the images or works, artworks, created for, and [sic] or those purchased by Tamarind/affiliates*." This means that the 2003 Agreement extinguished any residual rights MFH could have had in the Artwork.

54. All of MFH's obligations under the 2003 Agreement would survive the termination of the agreement "regardless of the manner of such termination, and shall be binding upon my heirs, executors, administrators, and legal representatives."

55. The 2003 Agreement is governed by "the laws of the State of New York." It also contained a venue selection clause, providing that "[a]ny claims or legal actions by one party against the other shall be commenced in New York State or Federal court located in New York State, and I [MHF] hereby submit to the jurisdiction and venue of any such court."

56. MFH and Mr. Charugundla (on behalf of Tamarind) signed the 2003 Agreement on April 11, 2003.

   **E. MFH Visited New York Often, Never Objecting to Tamarind's Uses and Reproductions of the Artwork**

57. Upon Mr. Charugundla's return to New York in 2002, he stored the Artwork until April 2003 when the Tamarind Gallery space at 142 East 39 Street, New York, New York, 10016 was ready.

58. At that point, Mr. Charugundla showcased the 60-foot Artwork in the Tamarind Gallery.

59.     Both before and after the sale, MFH knew that Tamarind would and did publicly display the Artwork in New York City.

60.     Tamarind prominently and publicly displayed the Artwork continuously from 2003 until 2007.

61.     During that time, MFH regularly visited New York City for business and pleasure, attending numerous events at the Tamarind Gallery where the Artwork was displayed. During these visits, MFH transacted various business in New York conservatively worth hundreds of thousands of dollars.

62.     For example, one time in April 2003, MFH visited the Tamarind Gallery for an exhibition of his work. While there, MFH painted another new piece for Tamarind. That painting was also publicly displayed in the Tamarind Gallery.

63.     On another occasion after the April 2003 visit, MFH returned to New York City. During that visit he attended another exhibition at the Tamarind Gallery. At that exhibition, MFH painted yet another piece for the Tamarind Gallery.

64.     On yet another visit to New York in September 2003, MFH asked Mr. Charugundla to host his 88th birthday celebration at the Tamarind Gallery. On September 27, 2003, MFH and Mr. Charugundla along with throngs of guests attended MFH's 88th birthday celebration at the Tamarind Gallery in New York. During which he continued to conduct business and painted more works for Tamarind.

65.     MFH visited New York again in 2004. During this visit, he again painted a work for Tamarind.

66.     In yet another example of MFH's frequent visits to New York City, he travelled to New York in April 2005. During his stay, Mr. Charugundla and MFH hosted a joint cocktail party at the Tamarind Gallery where the Artwork was featured and discussed among the many guests.

Yet again, MFH painted another largest single work titled "M F 90" "My life 90" (tile of which later on changed to different name) measuring 11feet height by 45 feet wide.

67. At each of MFH's frequent stays in New York City, he visited the Tamarind Gallery where the Artwork was displayed. Rather than objecting, MFH encouraged its continued display. MFH allowed every guest to take photos with the art works and post them in their own social media posts.

68. Indeed, MFH never objected to anything Tamarind did with the Artwork.

69. In 2007, MFH and his daughter RH came to New York once again, to conduct business and paint again for Tamarind.

70. During this visit, however, MFH and his daughter did something strange and concerning. Specifically, MFH along with RH gave Mr. Charugundla a copy of the original December 2, 2002 Merrill Lynch check. He told Mr. Charugundla that he never cashed or deposited it and asked Mr. Charugundla how he could cash it.

71. Mr. Charugundla felt obliged to find out about the status of the check. Mr. Charugundla went to Merrill Lynch in New York and asked if they could cash it. Merrill Lynch refused, telling Mr. Charugundla that MFH had cashed the check five years earlier on December 10, 2002—just a week after receiving it. Mr. Charugundla complained to MFH that he had put Mr. Charugundla in a very awkward position with Merrill Lynch.

72. On April 24, 2007, MFH and his daughter, RH drafted and signed a letter in New York, acknowledging and reaffirming that on December 2, 2002, MFH had sold Tamarind the Artwork. In the same letter, MFH and RH also acknowledged and reaffirmed that MFH had cashed the check on December 10, 2002.

73. MFH ended the signed letter: "It is totally my mistake and my ignorance that I put Mr. Charugundla . . . and . . . Merrill Lynch under these awkward circumstances." MFH then

"apologize[d] for any inconvenience and embarrassment [he] may have caused . . . Mr. Charugundla."

74. In any event, since 2002, MFH grew very fond of Mr. Charugundla. In 2007, MFH handwrote a letter for Mr. Charugundla.

75. In that letter, MFH described Mr. Charugundla as a "dear friend" with "an exceptional personality." MFH continued that Mr. Charugundla had "opened a window on the Indian contemporary art scene" to New Yorkers at his "well-located Tamarind Art Gallery," in New York.

76. In 2007, Tamarind published a book (in New York) about the Artwork unsurprisingly titled "Lightning: From the Private Collection of Marguerite and Kent Mr. Charugundla." The book discussed MFH's life and works but was mostly about the Artwork. It featured several reproductions of the Artwork. Tamarind sold many copies of the book without objection from MFH. While the book is out of circulation now, it periodically appears on secondary platforms for $500.00. MFH encouraged Tamarind's efforts to publish and sell the book.

77. In 2007, the Tamarind Gallery took down the Artwork to make room for other MFH works. The Artwork was stored in the Tamarind Gallery but was taken out and publicly displayed every 3-4 months for exhibitions attended by hundreds of people.

78. In 2008, MFH wrote Mr. Charugundla another handwritten letter titled "Lightning at Tamarind Art, New York." In this letter he described the Artwork in detail and said, "the world should take note" of the Artwork.

79. On or about September 20, 2009, MFH again visited New York to attend his 94th birthday celebration at the Tamarind Gallery. During this time, he painted yet again in front of

guests for Tamarind on a large canvas and titled "Voyage of Discovery," all of copyrights for which were also owned by Tamarind.

80. MFH continued to regularly visit New York regularly with his daughter RH, and each time visited the Tamarind Gallery to view the Artwork on display and to conduct business and paint more works for Tamarind.

81. MFH passed away on June 9, 2011 in London, England.

82. Tamarind published another book in 2015 "Voyage of Discovery" in which "Lightning" was re-published on pages 150-151, received no objection from the Estate.

83. After his passing until today, the Tamarind Gallery has stored the Artwork in Long Island City, New York. In 2019, it was exhibited at The Asia Society in Manhattan. From the time Tamarind acquired the Artwork until today, the Artwork has never left New York State.

84. MFH never once complained or objected to Tamarind's use, display or reproduction of the Artwork from the time Tamarind acquired it in 2002 until his passing in 2011.

85. In fact, Tamarind displayed the Artwork continuously in one form or another from 2002 until today, without objection.

86. Recently, in 2019, Tamarind published another book about the Artwork titled, "Lighting by M.F. Husain." Like the previous book, it contained various reproductions of the Artwork. Again, Tamarind published and sold this book without objection.

**F. The Lightning NFT Project**

87. In 2022 LNMH LLC, a limited liability company and affiliate of Tamarind launched a project called LightningNFT ("NFT Project"). Mr. Charugundla is LNMH LLC's sole member.

88. The purpose of the NFT Project is to create and sell non-fungible tokens—a digitized form of the Artwork.

89. Non-fungible tokens or NFTs are unique data assets that are stored on a digital ledger and can be bought and sold by the public.

90. NFTs are purchased in connection with cryptocurrency, which is universal digital currency that exists online. One form of cryptocurrency is Ethereum.

91. Ethereum is a decentralized blockchain platform that establishes a peer-to-peer network that securely executes and verifies application code, called smart contracts. Smart contracts allow participants to transact with each other without a trusted central authority. Transaction records are immutable, verifiable, and securely distributed across the network, giving participants full ownership and visibility into transaction data. Transactions are sent from and received by user created Ethereum accounts. A sender must sign transactions and spend Ether, Ethereum's native cryptocurrency, as a cost of processing transactions on the network.

92. NFTs are used to represent easily reproducible items such as paintings, photos, videos, audio, avatars and other types of digital files as unique items.

93. Unlike cryptocurrencies where each coin is the same, each NFT is unique and can be sold to prove ownership over some sort of digital file.

94. The NFT Project intends to be a "drop" of an undetermined number of NFTs with 62 unique traits. Each NFT will represent one of the Artwork's 12 panels with its own trait.

95. No NFTs related to the NFT Project have been minted for sale yet and none have been sold.

**G. The January 8, 2022 Cease and Desist Letter and Existence of an Actual Controversy**

96. On January 8, 2022, Mr. Charugundla (Tamarind) received a letter from counsel to the M.F. Husain Estate ("Cease and Desist").

97. In the Cease and Desist, the M.F. Husain Estate stated that Mr. Charugundla has no right to proceed with the NFT Project. While the M.F. Husain Estate admitted that Mr. Charugundla owns the original Artwork, the Estate contended that Mr. Charugundla no right to "right to reproduce it, distribute copies, create derivative works based on it or display it publicly."

98. The Cease and Desist demanded that the NFT Project immediately cease operations, cease any marketing efforts related to the NFT Project, and cancel all pre-sales.

99. The Cease and Desist stated that the NFT Project would violate multiple provisions of the Copyright Act.

100. In apparent preparation for litigation, the Cease and Desist also included a demand that Mr. Charugundla preserve all documents, communications and data of any kind related to the Artwork.

101. Tamarind has a substantial investment ($400,000.00) in the Artwork and its ownership of the associated intellectual property rights. M.F. Husain Estate's demands in the Cease and Desist currently subject Tamarind to a real and reasonable apprehension that the continuing operation of NFT Project will lead to litigation by the Estate against Tamarind claiming infringement and related liability, which would disrupt Tamarind's business operations and impair its investment. Thus, Tamarind has launched this action to seek, among other things, to declare Tamarind's rights to proceed with the NFT Project and to declare that the NFT Project does not infringe on any of the Estate's supposed intellectual property rights in the Artwork.

**FIRST COUNT**
(Declaratory Judgment - Non-Infringement)

102. Tamarind repeats and realleges the allegations in the preceding paragraphs the Complaint with the same force and effect as if fully set forth herein.

103. The Bill of Sale and the 2003 Agreement ("MFH Agreements") are valid, binding, and existing contracts between Tamarind and MFH, whose interests—if any—are represented by the Estate.

104. As a result of the Estate's demands and Cease and Desist, an actual controversy has arisen and now exists relating to the Parties' respective rights related to the Artwork.

105. Through his words, agreements, conduct and omissions, MFH granted Tamarind, among other rights, "an exclusive, royalty free, worldwide license [("License")] to display, market, reproduce and resell all or any part of the artwork, including all intellectual property in respect thereof." (Exhibit A, § 1.1). This included the right to reproduce the Artwork digitally.

106. In the 2003 Agreement, MFH went further, agreeing that "Artist [(MFH)] agree/s that all artworks already purchased or created for Tamarind/affiliates are considered copyright protected property of Tamarind or its affiliates." All artworks already purchased include Artwork at issue.

107. The 2003 Agreement extinguished any residual rights the Estate may have had in the Artwork as Tamarind became the Copyright owner of the Artwork.

108. These words, agreements, conduct and omissions grant Tamarind the right to proceed with the NFT Project without interference from the Estate.

109. As it relates to the NFT Project, Tamarind has taken all necessary care to ensure that the integrity and form of the Artwork is not violated and has taken all precautions to reproduce the artwork in the true representation or its original form.

110. The intellectual property grants, licenses, transfers, assignments or consents by MFH are binding and irrevocable as against the Estate in favor of Tamarind, since MFH received valuable consideration from Tamarind.

111. Tamarind is entitled to an order declaring the NFT Project does not constitute infringement of any rights, directly or indirectly, which are now claimed to be owned by the Estate.

112. This order will allow Tamarind to proceed with the NFT Project without disruption and fear of litigation.

113. There is no better or effective alternative remedy because declaratory relief over the copyright ownership and licensing issues form the central claims here and no other relief can be sought to declare the rightful ownership of the Artwork and the scope of Tamarind's other intellectual property rights.

## SECOND COUNT
(Declaratory Judgment - Ownership)

114. Tamarind repeats and realleges the allegations in the preceding paragraphs the Complaint with the same force and effect as if fully set forth herein.

115. An actual controversy has arisen and now exists relating to the Parties' respective rights (or MFH's lack thereof) related to the Artwork.

116. In the 2003 Agreement, MFH agreed that "Artist [(MFH)] agree/s that all artworks already purchased or created for Tamarind/affiliates are considered copyright protected property of Tamarind or its affiliates." All artworks already purchased include Artwork at issue.

117. The 2003 Agreement extinguished any residual rights the Estate may have had in the Artwork as Tamarind became the Copyright owner of the Artwork.

118. These words, agreements, conduct and omissions grant Tamarind the right to proceed with the NFT Project without interference from the Estate.

119. The Cease and Desist claimed that the NFT Project would violate various sections of the Copyright Act.

120. Tamarind is entitled to an order declaring the NFT Project does not constitute infringement of any rights, directly or indirectly, which are now claimed to be owned by the Estate.

121. Similarly, Tamarind is entitled to an order that the NFT Project will not violate any section of the Copyright Act.

122. Tamarind is entitled to an order declaring the NFT Project does not constitute infringement of any rights or copyrights, directly or indirectly, which are now claimed to be owned by the Estate.

123. Such an order will allow Tamarind to proceed with the NFT Project without disruption and fear of litigation.

124. There is no better alternative or more effective remedy because declaratory relief over the copyright ownership and licensing issues form the central claims here and no other relief can be sought to declare the rightful ownership of the Artwork and the scope of Tamarind's other intellectual property rights.

**THIRD COUNT**
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

125. Tamarind repeats and realleges the allegations in the preceding paragraphs the Complaint with the same force and effect as if fully set forth herein.

126. The MFH Agreements are valid, binding, and existing contracts between Tamarind and MFH, whose interests—if any—are represented by the Estate.

127. Implied in the Agreements is a covenant of good faith and fair dealing during performance.

128. At all times relevant here, the Estate had a duty to act in good faith and to diligently honor and perform its obligations under the Agreements and to deal with Tamarind fairly.

129. The Estate breached the covenant of good faith and fair dealing towards Tamarind by interfering with the NFT Project without basis and in bad faith—simply to destroy the benefit of the Parties' bargains and prevent the launch of the NFT Project.

130. Tamarind has and continues to be damaged by the Estate's interference because NFT launches are sensitive to market conditions and the Estate hopes to delay the NFT Project in the hopes that the NFT market crashes.

**WHEREFORE**, Tamarind demands judgment in its favor and against the Estate as follows:

    a.    Tamarind seeks Declaratory Judgment, under the federal declaratory statute, 28 U.S.C. § 2201 *et seq*. and FED. R. CIV. P. 57, and requests that this Court declare as follows:

        i.    that under the Agreements, the NFT Project does not constitute infringement of any rights, directly or indirectly, which are now claimed to be owned by the Estate;

        ii.    the 2003 Agreement extinguished any residual rights the Estate may have had in the Artwork and Tamarind became the Copyright owner of the Artwork;

        iii.    the Estate, by receiving good and valuable consideration for the Agreements, and through the Tamarind's, MFH's and the Estate's course of dealing and conduct over 19 years gave Tamarind the copyright and an exclusive, worldwide, irrevocable, royalty-free actual or implied license to use the Artwork in its sole discretion, including as the basis for the NFT Project;

        iv.    The Estate does not control sole and exclusive copyright ownership over the Artwork under the Copyright Act;

        v.    Neither Tamarind nor the NFT Project exceeded the scope of any exclusive, worldwide, irrevocable, royalty-free license as set forth above, 17 U.S.C. § 501 *et seq.*, through its past or current use of the Artwork or through the NFT Project; and through MFH and the Estate's knowledge of intended and actual uses of the Artwork and

      its failure to assert or enforce any claimed infringement of the scope of the implied or actual license; and

  vi. Because of the Agreements, Tamarind has the right to proceed with the NFT Project under 17 U.S.C. 204.

b. Grant Tamarind's claim for Declaratory Judgment as requested above;

c. Award Tamarind all economic and noneconomic damages in an amount to be proven at trial;

d. Award Tamarind pre- and post-judgment interest as provided by law; and

e. Grant Tamarind such other and further relief as the Court deems just and proper.

Dated: New York, New York
   January 21, 2022

                Respectfully submitted,

                OFFIT KURMAN, P. A.

                By: /s/ Lucas A. Markowitz, Esq.

                Laura J. Winston, Esq.
                Lucas A. Markowitz, Esq.
                590 Madison Avenue, 6th Floor
                New York, New York 10022
                Telephone: (212) 545-1900
                Facsimile: (212) 545-1656
                lwinston@offitkurman.com
                Lucas.markowitz@offitkurman.com
                *Counsel for Plaintiff Tamarind*